# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

_____

## No. ACM 39676

_____

### UNITED STATES
*Appellee*

v.

### D'Andre M. JOHNSON
Second Lieutenant (O-1), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 16 October 2020

_____

*Military Judge*: W. Shane Cohen

*Sentence*: Dismissal, confinement for 10 years, and forfeiture of all pay and allowances. Sentence adjudged 1 December 2018 by GCM convened at Moody Air Force Base, Georgia.

*For Appellant*: Mark C. Bruegger, Esquire; Catherine M. Cherkasky, Esquire.

*For Appellee*: Lieutenant Colonel Brian C. Mason, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial composed of officer members convicted Appellant of one specification of sexual assault of AM, by penetrating

AM's vulva with his penis, while AM was incapable of consenting to the sexual act due to impairment by alcohol, and one specification of sexual assault of MP, by penetrating her vulva with his finger by causing bodily harm, both in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The panel sentenced Appellant to a dismissal, confinement for ten years, and forfeiture of all pay and allowances. The military judge credited Appellant with 138 days against his sentence for time Appellant spent in pretrial confinement. The convening authority approved the sentence as adjudged.

Appellant raises three assignments of error (AOE) on appeal: (1) whether the evidence is legally and factually sufficient to support the conviction of sexual assault against MP; (2) whether trial defense counsel provided ineffective assistance of counsel; and (3) whether Appellant suffered cruel and unusual punishment in violation of the Eighth Amendment[2] and Article 55, UCMJ, 10 U.S.C. § 855, when he was not given proper medical treatment while in confinement. Alternatively, Appellant contends that the conditions of his post-trial confinement render his sentence inappropriately severe, warranting relief under Article 66(c), UCMJ, 10 U.S.C. § 866(c). In addition, as part of our consideration of Appellant's second AOE, we consider the issue of whether the military judge abused his discretion in allowing portions of MP's unsworn victim impact statement to be presented to the members at the sentencing hearing.

Finding no error materially prejudicial to a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant graduated from the United States Air Force Academy in 2017. After graduation, Appellant was assigned to Moody Air Force Base, Georgia, as a Logistics Readiness Officer. After his arrival, Appellant subsequently joined a fitness center in neighboring Valdosta, Georgia, where he met MP, who was an assistant manager at the gym.

Until the night of the offense, MP had seen Appellant twice and talked to him once, and, although she knew him from the gym, AM had never talked to Appellant directly. Appellant started "following" MP on the social networking application Instagram, and on 14 September 2017, made a comment to one of MP's posts at 2159 hours. Appellant and MP continued to chat via Instagram;

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] U.S. CONST. amend. VIII.

on 15 September 2017, MP gave Appellant her phone number after Appellant requested her number and they texted back and forth. The Instagram and text messages consisted of messages of a flirtatious nature, discussions about football and families, and some sexual innuendos. On 16 September 2017, MP told Appellant of her plans for that evening, which included going to a local bar, known as the Bluewater Bar, with some friends, including her friend AM (also her co-worker). Appellant responded that maybe he would see her "out Saturday night." In all, before MP and Appellant would meet up on the night of 16 September 2017, they had been messaging and texting each other for less than 48 hours.

On 16 September 2017, MP and AM went out to dinner with friends. MP had a mixed drink at dinner, while AM did not have any alcohol. Thereafter, the group went to the house of a friend, JP, where MP had another mixed drink. At around 2330 hours, the group left for Bluewater. The bar was approximately a five-minute walk from JP's house. AM consumed shots and mixed drinks at JP's house prior to going to Bluewater, and she had more shots and mixed drinks at Bluewater. AM consumed "a lot" of alcohol, but could not recall how much. She opined she had "never drank that much" alcohol in her life.

Appellant arrived at Bluewater around 2100 that evening. Prior to his arrival, Appellant consumed five or six shots, along with five or six beers, with friends at another bar. After MP arrived at Bluewater, she eventually met up with Appellant. At 0102 on 17 September 2017, Appellant and MP were texting with each other, with Appellant asking MP where she was in the bar. While at Bluewater, MP and Appellant spent time with each other at the bar, grinding[3] on each other while dancing and kissing.

At approximately 0200 on 17 September 2017, Bluewater closed. A group of individuals, including MP, AM, Appellant, Senior Airman (SrA) CC, and others, decided to go to JP's house; JP and her male friend, SrA KC, were already at JP's house. According to SrA CC, the group left Bluewater between 0200 and 0215. AM was very intoxicated, slurring her words, unbalanced, and falling to the ground. Because of her condition, SrA CC gave her a "piggyback ride" to JP's house.

Once they arrived at JP's house, the group mingled outside for an undetermined amount of time before going inside. MP and Appellant continued kissing outside of JP's residence. MP asked JP if Appellant could "stay" the night at JP's house; JP agreed.

---

[3] When defense counsel asked the witness, "What is grinding?" the witness replied, "Female in front of the male, rubbing against each other."

Some individuals eventually left JP's house. Those that remained were MP, AM, Appellant, and SrA CC, along with JP and SrA KC. Once the group entered the house, SrA CC "plopped [AM] down into the chair" near the front door. Although the group wanted to continue drinking and play cards, they were concerned about AM because she was "way out of it and looked extremely intoxicated." It was decided to put AM in JP's son's vacant room, which was next to the bathroom. As SrA CC was getting ready to pick up AM to move her, Appellant picked AM up "like a child" and carried her to JP's son's bedroom. The group followed Appellant into the bedroom as he laid AM on the bed. The group suggested SrA CC stay with AM and cuddle with her until she fell asleep, which he agreed to do. SrA CC lay down next to AM on his back, and AM cuddled against SrA CC, putting her left leg and arm across his body, and her head on SrA CC's chest. Shortly after, AM fell asleep. AM still had her clothes on; she was wearing a "romper," a one-piece outfit (MP was also wearing a romper during the evening). SrA CC testified the bedroom was not pitch black, as the door had been cracked open to allow some light from the hallway to come into the room.

SrA KC testified that after putting AM to bed and after shutting the door, Appellant and MP were on the couch kissing and touching each other. SrA KC and JP asked if MP and Appellant needed a blanket. When they did not get a response, SrA KC stated [he] "threw a blanket at them, turned the lights off, and . . . went back to [JP's] room." SrA KC stated he observed Appellant and MP from the time they entered the house until he went to bed, and although she was drunk by appearance, MP was coherent. SrA KC also stated he heard laughter from MP and Appellant and that they "were very physically connected."

JP testified that when she woke up to go to the bathroom, she went into the living room to check on MP and Appellant and found them "making out" on the couch. One was on top of the other, although she did not recall who was on top. When asked by defense counsel if JP had any concern about MP's well-being when she entered the living room, she stated:

> No, if I thought something was of a harm, I would have done something about it. . . . [A]t that moment, I didn't see anything that was going wrong. Not saying that something couldn't have gone wrong afterwards.

SrA CC received a text at 0254 and responded to that text at 0302. Shortly after, he fell asleep. At approximately 0330, while still lying next to AM, SrA CC woke up feeling something was strange. When he opened his eyes, he saw Appellant behind AM. He could see Appellant was naked. SrA CC further stated AM was "positioned as her right knee was on the carpet and her left

4

knee was on the bed. It was not on me anymore, and as in she was still on her stomach and her head was still on my chest." SrA CC stated Appellant was on both knees, "moving back and forth in a thrusting motion." At this point, as he was waking up, SrA CC realized that Appellant was penetrating AM's vagina with his penis. SrA CC "tried to shove" Appellant off AM, and was finally able to push him off AM within "about three pushes." SrA CC stated that AM's romper had been slid to the right to allow Appellant's penis to enter her vagina. SrA CC was "[o]ne hundred percent" confident he saw Appellant's penis inside AM's vagina, stating he could tell Appellant was not wearing a condom and that he "vividly remember[ed] the shape of [Appellant's] penis. Like that will not—never leave my head—ever."

While SrA CC was pushing Appellant off AM, Appellant said, "It's okay. It's [MP]." SrA CC said, "No man. It's not [AM]—I mean [MP]. It's [AM]." Appellant then stated, "No. This is [MP]." SrA CC told Appellant, "You need to get off." Appellant then stated, "Oh," and after SrA CC pushed Appellant off AM, Appellant kept saying, "I'm sorry. I'm sorry." SrA CC then escorted Appellant out of the room and locked the door. During this time, AM was still unconscious with her eyes shut, and she was still lying with half her body on the bed, even after SrA CC escorted Appellant out of the room.

SrA CC panicked. After about 10–15 minutes trying to decide what to do, at 0343, SrA CC texted his roommate, SrA DS, and his other roommate, JL. SrA DS called him back. SrA CC walked out of the bedroom and into the living room, where he saw MP and Appellant both on the couch. MP was on one side; Appellant was on the other. Both were sleeping. SrA CC tried to wake up MP, telling her, "Hey. This is an emergency. You need to go into the room with [AM]." MP would not wake up. According to SrA CC, MP was "unconscious however, she was moving. It looked like she was fighting to wake up however, she just couldn't get there until I had to put my hands on her and shake her [on her shoulders] a little bit, be a little louder, and then finally she did . . . awake to understand what I was saying." SrA CC escorted MP to the bedroom where AM was lying. AM was still "completely" unconscious. MP fell asleep on the floor; AM was on the bed.

SrA DS showed up at the house at approximately 0400. When he arrived, Appellant was on the couch. SrA DS did a sweep of the house to make sure there were no kids in the house. SrA DS and SrA CC had trouble waking Appellant, who was in his underwear (described by SrA DS as "gray with a black waistband, spandex type") and was "passed out unconsciously on the couch." Appellant's clothes were on the floor next to the couch. SrA DS tried to wake Appellant, telling him, "Hey. You're not wanted here. You need to leave right now." Using Appellant's phone (which Appellant unlocked), SrA DS called Appellant an "Uber" ride to get him out of the house.

SrA DS woke JP and SrA KC up and told them what was going on. Then SrA CC and SrA DS helped Appellant off the sofa to get him dressed. Appellant's clothes were on the floor next to the couch. Appellant dressed in the bathroom. SrA DS walked Appellant outside, sat him down, and waited for the Uber. The Uber arrived a short time later and took Appellant to his home. According to the Uber driver's video, Appellant was picked up from JP's residence at 0417 and dropped off at his own residence at 0430.

After Appellant left in the Uber, there was additional discussion on what to do about AM, who was still unconscious in the bedroom. SrA KC, who was a security forces member, called his supervisor to discuss who would have jurisdiction. His supervisor told him to call 911. JP went to the room where AM and MP were sleeping and at approximately 0534, SrA KC called 911 and reported that AM had been sexually assaulted.[4] When SrA KC called 911, he was not aware MP believed Appellant had also sexually assaulted her.

Officer BT, a deputy sheriff, responded to the 911 call. Initially, he was told of only one victim. Officer BT talked to SrA CC about the situation and then went into the bedroom where AM was still unconscious. Officer BT stated, "[AM] was not coherent at the time and she was still in the process of being woke up in the front bedroom." At some point while Officer BT was there, AM woke up and was "hysterically crying" after being told what happened. After talking to a few people, Officer BT then spoke with MP, who made a comment that "she didn't consent either." Officer BT began to ask questions to MP, who told him that Appellant had digitally penetrated her, and that the entire time he was trying to do this, she was "trying to push him off, and was telling him to stop." At this point, Officer BT believed he had two victims and arranged for both AM and MP to undergo a forensic evaluation for sexual assault.

DNA was later taken from Appellant, AM, and MP. Although no semen was found in MP's underwear, AM's cervical swabs, or AM's rectal swaps, Appellant's DNA was found in AM's cervix and rectum. AM's DNA was also found in Appellant's underwear. The results also indicated that Appellant's and AM's DNA were found in MP's underwear.

---

[4] SrA KC recalled calling 911 at approximately 0520; Officer BT testified the call came in at 0534. He then stated it only took him five minutes to get to JP's residence.

## II. DISCUSSION

### A. Legal and Factual Sufficiency of Sexual Assault of MP

#### 1. Additional Background

At trial, MP testified that even though she was texting with Appellant, she tried to deflect some interest in Appellant through some of her responses. Nonetheless, MP told Appellant she would be at the Bluewater Bar the evening of 16 September 2017. MP stated she met up with Appellant at Bluewater and he got her a drink. According to her testimony, MP remembered little after this event. After Appellant brought her a drink, MP stated she did not remember the following events: (1) dancing with Appellant; (2) leaving Bluewater that night with Appellant; (3) walking to JP's house; (4) taking pictures on her phone; (5) asking JP if Appellant could stay at her house; (6) JP asking MP if she was okay while she was kissing Appellant on the couch; and (7) JP asking if MP was okay or if she needed a blanket.

MP testified that her next memory after Appellant brought her a drink at Bluewater was "waking up on the couch with [Appellant] on top of [her]." She testified that:

> [Appellant] was on top of me kissing me, and I, kind of like, re-alized, started to realize, kind of what was going on. I remember, kind of pushing him off, and then, kind of, I guess, went out again, I guess is a way to put it.

MP stated Appellant was wearing a pink shirt and was pretty sure he had his pants on.

The next memory MP had was waking up to Appellant having his hand in her romper outfit. MP stated she had to "push his hands out of me, basically," referring to Appellant having his fingers in her vagina. When she realized Appellant's hands were inside her, she "had to push them out." She stated, "I told him no, and I told him stop."

MP testified,

> I remember pushing him off, and then I remember him finally getting off, and I thought at that point he had left. So, I curled over into, like curled over into the couch, basically, I was trying to go—and trying to go to sleep, but that way he couldn't get to me, I thought. And then the next thing I remember, I guess I heard a sound or something. I am not sure what woke me up, but I remember seeing him. So, the bathroom light was on, and I remember seeing him, an outline, in the hallway, and he didn't

7

have any clothes on, and then I remember him being on top of me and he was in my face, saying my name.

**2. Law**

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, 2019 U.S. LEXIS 3102, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this court is "convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. Article 66(c), UCMJ; *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of sexual assault by bodily harm against MP in violation of Article 120(b)(1)(B), UCMJ, 10 U.S.C. § 920(b)(1)(B), which required the Prosecution to prove two elements beyond a reasonable doubt: (1)

that Appellant committed a sexual act upon MP by penetrating her vulva with his fingers; and (2) that Appellant did so by causing bodily harm to MP, to wit: penetrating her vulva with his fingers without her consent. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(b). "'[B]odily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act." *MCM*, pt. IV, ¶ 45.a.(g)(3).

With regard to consent, the statute explains,

> [t]he term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The statute further explains that "[a] sleeping, unconscious, or incompetent person cannot consent." *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

The defense of mistake of fact as to consent requires that an appellant, because of ignorance or mistake, incorrectly believe that another consented to the sexual contact. *See* R.C.M. 916(j)(1). In order to rely on a mistake of fact as to a consent defense, Appellant's belief must be honest and reasonable. *See id.*; *United States v. Gans*, No. ACM 39321, 2019 CCA LEXIS 162, at *14 (A.F. Ct. Crim. App. 11 Apr. 2019) (unpub. op.); *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). Yet, the "burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *McDonald*, 78 M.J. at 381. An "[a]ppellant's actions could only be considered innocent if he had formed a reasonable belief that he had obtained consent. The government only needed to prove that he had not done so to eliminate the mistake of fact defense." *Id.*

### 3. Analysis

The timing of Appellant's actions towards both MP and AM are critical to determining legal and factual sufficiency. At 0254 on 17 September 2017, SrA CC received a text and responded to that text at 0302. Shortly after, he fell asleep; the door to his room was cracked open. At approximately 0330, SrA CC awoke to Appellant penetrating AM with his penis while Appellant was on his knees.

Prior to 0302, there is no indication of any mal-intent on the part of Appellant towards either MP or AM. In fact, regarding MP the converse is true: the testimony shows that MP was somewhat, if not very, interested in Appellant. The text messages leading up to Appellant and MP meeting at the Bluewater show a rapid escalation in MP and Appellant's relationship. MP was observed both dancing and "grinding" with Appellant at Bluewater, and kissing him outside JP's residence. No witness indicated MP was in distress at any point during the night. MP asked JP if Appellant could stay the night at the house. Both JP and SrA KC indicated MP was engaged in intimate behavior with Appellant while in JP's residence. SrA KC heard laughter coming from the living room. JP did not sense anything was wrong between MP and Appellant, and even went so far as to say that if she thought MP was in harm, she would have done something about the situation. Before 0302, when SrA CC received a text, there is nothing in the record to suggest that Appellant committed a sexual assault against MP.

Appellant argues that MP's claim of sexual assault is inconsistent with the balance of the evidence and demonstrates Appellant's reasonable mistake of fact as to consent. Had MP alleged a sexual assault occurring before SrA CC fell asleep at 0302, the facts above indicate a viable argument. However, the fact that AM's DNA was found in MP's underwear supports a conclusion that Appellant sexually assaulted MP *after* he penetrated AM and before SrA CC saw MP and Appellant on the couch around 0345. The following evidence supports this conclusion: (1) Appellant was clothed when MP said "no" and "stop" on the couch; (2) SrA CC testified he saw Appellant's clothes near the couch and Appellant was naked when he was in the bedroom, which supports an inference that Appellant took off his clothes in the living room before he sexually assaulted AM; (3) Appellant told SrA CC it was okay he was having sex with MP, when he was actually having sex with AM, and that he was "sorry"; (4) MP remembered seeing Appellant naked in the hallway; (5) MP testified she was asleep when Appellant came back to the couch; (6) SrA CC saw MP and Appellant asleep on the couch when he came out to the living room; and (7) SrA CC's observation of Appellant on the couch in his underwear indicated to him Appellant put his underwear back on after he left AM's room and returned to the couch where MP slept. Appellant penetrated AM's vagina with his penis,

and after SrA CC pushed Appellant off AM, Appellant moved back to the couch, where he digitally penetrated MP's vagina. The evidence does not support a finding that Appellant had a reasonable or honest belief that MP was consenting to Appellant's digital penetration.

Appellant argues that MP had a personal motive to fabricate her allegations against Appellant due to an ongoing child custody battle with her soon-to-be ex-husband. Appellant hinges this argument on the fact that SrA DS, who showed up at JP's house right after the sexual assaults, was a friend of MP's soon-to-be ex-husband, and had MP's ex-husband learned MP had been engaged in sexual activities "with an accused sexual assaulter on the same night her friend, AM, was attacked," it could cast her in an unfavorable light in those proceedings. Appellant notes the timing of when MP came forward, stating MP only decided to report her alleged assault after SrA DS showed up.

We find no evidence to support this attack on MP's credibility. The Defense has essentially asked us to speculate why MP did not tell anyone what happened to her before her disclosure to Officer BT. There was no evidence, or comments, or any reaction to MP seeing SrA DS in a negative light when he showed up to assist. In fact, SrA DS testified that MP told SrA DS that Appellant pressed on her, that he was aggressive, and that she told him no. MP's comments to SrA DS could be viewed as MP trying to prevent or preempt SrA DS from telling MP's husband that MP was possibly engaged in sexual activity, by fabricating a sexual assault when SrA DS suddenly showed up at the house. However, from this court's review of the testimony and evidence, the record suggests this is not the case. Most importantly, there was no evidence SrA DS called MP's husband to inform him of what happened to MP. MP did report an assault to Officer BT. Finally, MP subjected herself to a SANE examination.

In assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Government. In doing so, we conclude a reasonable factfinder could have found beyond a reasonable doubt all the elements to support Appellant's conviction of sexual assault against MP. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction of sexual assault against MP both legally and factually sufficient.

## B. Ineffective Assistance of Counsel Claim

### 1. Additional Background

Appellant asserts his trial defense counsel, Mr. JMB, Mr. LEC, Mr. JRH, and Captain (Capt) RM, were ineffective in that they (1) failed to submit a

resignation-in-lieu of court-martial (RILO) request within seven days of referral of Appellant's case; (2) engaged in harassing behavior against MP; and (3) offered a theory of the case that conceded Appellant's guilt. We examine each claim in turn.

Pursuant to Appellant's second assignment of error, on 7 May 2020 this court ordered Appellant's four trial defense counsel to provide affidavits or declarations that were responsive to Appellant's claims that he did not receive effective assistance of counsel.[5] We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes. Reviewing trial defense counsel's declarations and the record as a whole, we are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam).

Charges were preferred against Appellant on 18 April 2018, the preliminary hearing occurred on 1 June 2018, the case was referred on 21 June 2018, and Appellant was served with the referral on 29 June 2018. On 19 October 2018, three days before Appellant's initial trial date (22 October 2018), Appellant submitted a RILO. At trial, the military judge granted a defense request for a continuance until 26 November 2018 that was unrelated to the RILO submission.

The Government sought to proceed to trial while the decision of the Secretary of the Air Force on Appellant's RILO was pending. On 15 November 2018, the Chief of the Military Justice Division (JAJM) granted the Government permission to proceed to trial based on "the particular circumstances of [Appellant's] request to resign, including his failure to submit his request within seven (7) days of referral." Appellant's court-martial concluded on 1 December 2018 with findings of guilty to the Charge and its two specifications. On 4 April 2019, Appellant's request for a RILO was denied.

As part of his pretrial investigation, Appellant, through counsel, hired a private investigator to interview the witnesses who were identified as victims in the case. The investigator attempted to interview MP at her residence and place of employment. Upon receiving notice from trial counsel that MP requested a Special Victims' Counsel, the defense team notified the investigator to cease attempts to contact MP, and the investigator complied. Capt RM also stated that he talked to Mr. LEC and Mr. JMB and they related there was no intent to harass the alleged victim, only to investigate the case.

---

[5] This court did not receive a declaration from trial defense counsel, Mr. JMB. However, Mr. JMB did concur with Mr. LEC's declaration. Mr. LEC is a member of Mr. JMB's law firm and one of Appellant's defense attorneys. Appellant did not raise opposition to the absence of Mr. JMB's affidavit or declaration.

At trial, it was revealed that one of Appellant's civilian defense counsel, Mr. LEC, provided MP's blood alcohol report from the Georgia Bureau of Investigation and MP's written statement in Appellant's case to MP's husband's divorce attorney. In exchange, Mr. LEC received a deposition from the divorce proceedings.

As lead counsel for the Defense, Mr. JMB gave the closing argument at the conclusion of findings. According to Capt RM, Mr. JMB's strategy during closing argument was to raise reasonable doubt throughout the entirety of his argument. Mr. JMB talked about a "terrible mistake" by Appellant, stating that:

> I think it's a plausible suggestion that [Appellant] got up, went to the bathroom just a short distance away, just the end of the hallway. [Appellant] went in the bathroom, instead of going straight and coming right back out to [MP], [Appellant] took a left turn in a house he'd never been in and went into the bedroom instead. Another girl in there, near darkness. It's night. The only light was coming from the hallway. Both [women] were wearing black rompers. It doesn't make sense that he would go in there unless [Appellant] was just making a huge mistake with another guy laying on the bed.

Capt RM stated in his declaration:

> Based on my conversations with Mr. [JMB] about his closing argument prior to trial, the argument was not intended to be a misguided presentation of the case nor a concession of guilt, but a way to raise reasonable doubt as to the prosecution's presentation of the case.

Mr. LEC declared, "[a]ny defense theory tendered by the defense team during trial was a strategic decision made to obtain the best possible outcome for Appellant based on the facts known at the time."

### 2. Law

#### *a. RILO*

The Secretary of the Air Force clearly has authority to promulgate an administrative regulation providing for the tender of a RILO, if that officer has committed acts rendering him subject to such trial. *United States v. Little*, No. ACM 34726, 2003 CCA LEXIS 224, at *7 (A.F. Ct. Crim. App. 26 Sep. 2003) (unpub. op.) (citation omitted). When an officer has submitted a RILO, Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, ¶ 7.24.7.1 (8 Dec. 2017), dictates the process. Prior permission from the Air Force Legal Operations Agency, Military Justice Division (AFLOA/JAJM), is required before a case proceeds to trial if the officer accused has submitted a RILO on

which action is pending. *Id.* at ¶ 7.24.7. JAJM will "normally approve [government] requests for permission to proceed while a [RILO] is pending if the officer submitted the request more than seven calendar days after service of" referred charges. *Id.* at ¶ 7.24.7.1. However, when officers submit resignation requests within seven days of receiving referred charges, JAJM "will normally disapprove [government] requests for permission to proceed." *Id.* at ¶ 7.24.7.2.

### b. Ineffective assistance of counsel

We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In order for Appellant to prevail on a claim of ineffective assistance of counsel, he must demonstrate that counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment, and that the deficiency resulted in prejudice "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

We employ a presumption of competence, and apply a three-part test in assessing whether that presumption has been overcome: (1) "is there a reasonable explanation for counsel's actions?;" (2) "did defense counsel's level of advocacy 'fall measurably below the performance . . . [ordinarily expected] of fallible lawyers?;'" and (3) "[i]f defense counsel was ineffective, is there 'a reasonable probability that, absent the errors,' there would have been a different result?" *Gooch*, 69 M.J. at 362 (omission and alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

"[A] lawyer shall abide by a client's decisions concerning the objectives of representation, and . . . shall consult with the client as to the means by which

14

they are to be pursued." AFI 51-110, *Professional Responsibility Program*, Attachment 2, Rule 1.2(a) (5 Aug. 2014)).[6] "A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive trial by court members, the composition of the court, and whether the client will testify." *Id.*

"Whenever the law, nature, and circumstances of the case permit, trial defense counsel should explore the possibility of an early diversion of the case from the criminal process." AFI 51-110, Attachment 7, Standard 4-6.1(a). This includes requests for administrative discharge in lieu of court-martial. *Id.,* Discussion.

### 3. Analysis

#### a. Appellant's RILO case

As stated, Appellant did not submit a RILO until 19 October 2018, nearly four months after he acknowledged receipt of the referred charges. We understand Appellant's argument to be that by failing to submit the RILO immediately or soon after referral, his counsel's justification that approval of the RILO would save Government time, expense, and manpower was lost. More important to Appellant, his counsel also lost the justification of "uncertainty," which we understand to mean the uncertainty of whether the Government would continue to garner the victims' cooperation and their desire to testify in the Government's case at trial.[7] Coupled with a viable mistake of fact defense, as well as issues regarding MP's credibility, Appellant believes these factors support the notion that a timely RILO request would not have been a "[H]ail [M]ary," but a "legitimate and reasonable offer that should have garnered serious consideration."

Trial defense counsel rebutted Appellant's claims about his desire to submit a RILO. In his declaration to this court, Mr. LEC explained:

> The defense team regularly discussed the process for submitting a [RILO] request with Appellant, as well as the pros and cons associated [sic] submitting his request. Appellant was the ultimate decision maker as to whether to submit a request to resign in lieu of court-martial and as to the timing for its submission.

---

[6] This AFI was updated on 11 Dec. 2018.

[7] Appellant's brief highlights challenges the Government needed to overcome, including that AM "considered not going through with this case because [she] just wanted to put it in the past and get on with [her] life."

In his declaration to this court, Mr. JRH explained that he discussed the issue of the RILO multiple times with Appellant who was aware of his right to submit one. Mr. JRH stated, "Initially, [Appellant] stated that he did not want to submit a RILO, but then in October [Appellant] indicated that he would like to submit such a request—which was well after the date the charges were referred in June." Mr. JRH also stated,

> [I]t should be noted that based upon various conversations with the Chief of Military Justice and other members of the legal office, it was clear that there would not be any support for a RILO from the legal office or from the command. In short, the chances of a RILO being approved for a sexual assault case that had two victims was virtually nonexistent. . . . it was well after the referral of charges and there was not any support for such a resolution.

Appellant did not provide any documentation to rebut these declarations.

"[A] lawyer shall abide by a client's decisions concerning the objectives of representation, and . . . shall consult with the client as to the means by which they are to be pursued. . . . A lawyer shall abide by a client's decision whether to settle a matter." AFI 51-110, Rule 1.2(a) (5 Aug. 2014). In their declarations, trial defense counsel stated they advised Appellant before referral, yet Appellant chose to not submit a RILO until shortly before trial. Trial defense counsel abided by Appellant's decision on the matter, and therefore, we agree with Appellee that "trial defense counsel cannot be held ineffective for failing to submit a request to settle Appellant's case when they lacked the authority to submit such a request."

Further, Appellant notes there was no value in failing to request a delay in the trial pending the Secretary of the Air Force's decision on this matter. Given that the Government had a strong case, the lack of support for Appellant's request from the Government for the RILO, and timing of Appellant's RILO submission, it is unlikely the military judge would have granted a continuance on this collateral matter pending the Secretary's decision. We find that Appellant has failed to show any prejudice in the processing of a RILO, or that his counsel were ineffective regarding the timing of his RILO request, nor were they ineffective in failing to request a continuance of his trial from the court pending the Secretary's decision.

### b. Trial defense counsel's investigation of Appellant's case

We do not believe trial defense counsel engaged in harassing behavior against MP by hiring an investigator, as it is expected defense counsel would do their due diligence investigating facts. *See* AFI 51-110, Attachment 7,

16

Standard 4-1.1. Specifically regarding MP, as soon as trial counsel notified trial defense counsel that MP requested a SVC, the investigator stood down.

However, we have given great consideration to Appellant's claim that release of MP's records to her estranged husband, by Appellant's defense attorneys, damaged the Defense's case. Specifically, at the time of her sexual assault, MP was in the process of getting a divorce from her husband and child custody was a significant issue. Trial defense counsel provided to MP's husband's divorce attorney MP's blood alcohol report from the Georgia Bureau of Investigation and MP's written statement to investigators, in exchange for a deposition from the divorce proceedings. Ultimately, during their cross-examination of MP, trial defense counsel sought to show MP had a motive to fabricate being a victim; that, by claiming to be a victim and not a voluntary actor, she would be put in a better light in her ongoing divorce and custody proceedings. Mr. LEC stated in his declaration that this type of exchange of evidence, "is not prohibited in Georgia" and "at all times [Appellant's trial defense counsel] acted in conformance with the Georgia Rules of Professional Conduct."

During cross-examination of MP, assistant trial counsel objected to the relevance of MP's divorce proceedings. In the following Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, when asked by the military judge about the relevance of the child custody issue, trial defense counsel stated:

> Well, it certainly could have an impact, if someone is living a certain way and doing certain things that the court does not approve of. And I can certainly state my place, Judge. We are still in a very conservative venue here in South Georgia, and they expect mothers of children are not to go out and do certain things. And again, it is certainly better in a case arguably to be a victim, as opposed to being something else.

Ascertaining the situation, the military judge asked Mr. JMB, "why would you be releasing this discovery for this case to someone else, who had no interest?" Mr. JMB responded, "It was a quid pro quo for—he wanted something from us, for us, to give us the . . . . The deposition from the divorce." Mr. JMB stated this type of "quid pro quo" frequently happened in civilian court. Mr. JMB denied releasing any medical records. Shortly thereafter, trial defense counsel clarified the relevance of the information, stating that MP's level of intoxication that night "goes toward whether [MP] was out being promiscuous, or whether she was forcibly assaulted."

After some debate on the relevance of the documents, MP's possible motive, and the prejudice to the Defense regarding the release of the records, the military judge stated:

> [T]he real prejudice is not to you guys, because you are the ones, who released it. The real question is whether it is prejudicial to your client, and that's really my only concern here. Whether or not you guys did the right thing, that is something we are going to take up later, whether you released official government, you know, government documents that were part of a trial, and you released them as part of a quid pro quo agreement with another attorney, knowing that it would have a beneficial impact also to your particular case here, when those government documents were released under Rules for Courts-Martial, and under our guidelines, and under our ethical rules and those kinds of things, that is a separate issue, which we may take up after this trial is over. The real question is, why let your actions prejudice your client? That is my only concern right here.

> . . .

> I do have an issue with what you did. I don't care whether if it is the good old boys and girls network and that's how you work things. That is not the way it works in a court-martial. That is for official use only. That is how those documents are released.

Finding that there was grounds under Mil. R. Evid. 608(c), the military judge allowed minimal questioning of MP on the issue of her divorce and custody, as well as that SrA DS knew her husband, as proper bias, motive to misrepresent, and impeachment evidence of MP.

Yet, in her testimony at sentencing, MP noted that the documents trial defense counsel turned over to her husband's attorney resulted in the family-court judge's "concerns about [her] character and alcohol. And so at that point, he did not decide it was okay to give custody to us. So he, in turn gave custody to our grandmothers. And, I attended alcohol counseling and counseling for that." Trial counsel then asked MP if it was her understanding that the family-court judge's decision was a direct result of the documents turned over. MP responded, "That's my understanding; yes, sir." The military judge also allowed MP to provide information related to her divorce to be presented in an unsworn statement to the members.

After announcement of sentence, trial counsel reminded the military judge about the release of the documents. The military judge concluded that under Article 48, UCMJ, 10 U.S.C. § 848, his authority to punish for contempt was limited, and that Article 6(b), UCMJ, 10 U.S.C. § 806b, did not specifically indicate Article 48 was a remedy for an Article 6(b) violation. However, he left the door open in the event trial counsel chose to pursue contempt proceedings. They did not.

The Defense had no evidence that MP fabricated being a victim; it was a mere theory. The disclosure of documents in a "quid pro quo" transaction related to Appellant's case to MP's estranged husband's attorney was done to gain an advantage in an attempt to attack MP's credibility. Standard 4-4.3(a) of Attachment 7, AFI 51-110, states that defense counsel "should not use means that have no substantial purpose other to embarrass, delay, or burden a third person . . . ." While the disclosure of this evidence did burden and affect MP's civil case with her husband, we do not believe trial defense counsel's substantial purpose in the "quid pro quo" was to embarrass or burden MP. Additionally, revisiting Appellant's assignment of error on factual sufficiency, trial defense counsel had little evidence to attack MP's credibility. As Appellee argued, the Government's case was strong, and because Appellant did not have a credible defense to counter the evidence, there was no reasonable probability "absent trial defense counsel's investigation there would have been a different result at trial." Appellee also notes that the members were never informed how MP's husband gained the knowledge of Appellant's case. From our view, while we do not subscribe with, or condone, trial defense counsel's interactions with MP's husband's attorneys, we do recognize that trial defense counsel had an obligation to conduct a prompt investigation of this case and explore all avenues leading to facts relevant to the merits of the case. *See* AFI 51-110, Attachment 7, Standard 4-1.1.

With this said, evaluating whether trial defense counsel was ineffective on this issue, we look at the three-part test in in *Gooch*. First, was there a reasonable explanation for trial defense counsel's actions? *See Gooch*, 69 M.J. at 362. In this case, the Defense was trying to develop a theory that would attack MP's credibility. Second, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers?" *Id.* Pursuant to their obligations as Appellant's counsel, we would expect trial defense counsel to do their due diligence in conducting an investigation to discover all facts relevant to the case. Trial defense counsel took a risk in this case, in that, had they been able to attack MP's credibility with this information, Appellant could have been acquitted of the specification related to MP; conversely, if this information backfired, it could impact Appellant in sentencing. We find that there was no prejudice to Appellant, and that the level of advocacy provided by trial defense counsel did not fall below the performance expected of attorneys practicing in the military justice arena. Finding that trial defense counsel were not ineffective, we need not address the third prong of *Gooch* —"'a reasonable probability that, absent the errors,' there would have been a different result." *Id.*

19

### c. Trial defense counsel's theory of the case

The facts of this case strongly favored the Government's charging, particularly regarding AM. Trial defense counsel noted their strategy was to try to create as much reasonable doubt as possible. As Mr. JRH declared, the possible defenses were limited, given the eyewitness and scientific evidence against Appellant. Trial defense counsel did their best to attack the credibility and biases of witnesses, to provide explanations for Appellant's behavior, and ultimately in our view, they did not concede guilt. One of those explanations was the "terrible mistake" Appellant made when he thought AM was MP.

We do not agree with Appellant that "but for counsel's errors," the result of the proceedings would have been different. As Appellant stated, trial defense counsel could have offered a strategy of no defense or a limited defense; however, it is speculative how that might have helped Appellant in this case. Trial defense counsel could have chosen a different closing argument strategy. However, the record shows their trial strategy in this case was not unreasonable. That strategy brought relevant information to the attention of the members. We evaluate trial defense counsel's performance not by the success of their strategy, but whether counsel made reasonable choices from the alternatives available at trial. *See United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)). Under these circumstances, Appellant fails to overcome the strong presumption that counsel's performance was within the wide range of reasonable professional assistance.

## C. Portions of MP's Unsworn Victim Impact Statement

### 1. Law

Although not raised by Appellant in his brief, in light of the information provided by MP in her unsworn victim impact statement, we address whether the military judge abused his discretion in allowing portions of that statement to be presented to the members at the sentencing hearing. In *United States v. Hamilton*, this court stated that "Article 6b, UCMJ, gives victims the right to be reasonably heard through an unsworn statement, which is tantamount to victim allocution at sentencing." 77 M.J. 579, 584 (A.F. Ct. Crim. App. 2017) (citing *Kenna v. United States Dist. Court*, 435 F.3d 1011, 1014–16 (9th Cir. 2006); *United States v. Degenhardt*, 405 F. Supp. 2d 1341, 1351 (D. Utah 2005)). "R.C.M. 1001A broadly defines the scope of victim impact." *Id.* The court went further in *Hamilton*, stating:

> [U]nsworn victim impact statements offered pursuant to R.C.M. 1001A are not evidence, and therefore not aggravation evidence offered by the Prosecution.

. . . .

. . . The military judge has the obligation to ensure the content of a victim's unsworn statement comports with the defined parameters of victim impact or mitigation as defined by the statute and R.C.M. 1001A. *See* [*MCM*], pt. II, Discussion ("A victim's unsworn statement should not exceed what is permitted under R.C.M. 1001A(c) . . . . Upon objection or *sua sponte*, a military judge may stop or interrupt a victim's unsworn statement that includes matters outside the scope of R.C.M. 1001A"). A victim's right to be heard at sentencing is the right to be "reasonably" heard. 10 U.S.C. § 806b(a)(4). What a military judge may find to be "reasonable" in a particular context may be informed to some extent by legal principles embodied in the Military Rules of Evidence. However, those rules do not apply to victim unsworn statements, which are not evidence.

Mil. R. Evid. 403 addresses "legal relevance" and provides that "evidence" may be excluded notwithstanding its logical relevance. In the decision to allow a victim to exercise their right to be heard on sentencing, a military judge is neither making a relevance determination nor ruling on the admissibility of otherwise relevant evidence. Instead, the military judge assesses the content of a victim's unsworn statement not for relevance, but for scope as defined by R.C.M. 1001A.

*Id.* at 585–86 (Third omission in original).

Under R.C.M. 1001A(b)(2), "'victim impact' includes any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty."

When there is error regarding the presentation of victim statements under R.C.M. 1001A, the test for prejudice "is whether the error substantially influenced the adjudged sentence." *United States v. Barker*, 77 M.J. 377, 384 (A.F. Ct. Crim. App. 2018) (citation omitted). When determining whether an error had a substantial influence on a sentence, this court considers the following four factors: "(1) the strength of the [g]overnment's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citations omitted); *see also United States v. Machen*, No. ACM 39295, 2018 CCA LEXIS 419, at *12 (A.F. Ct. Crim. App. 29 Aug. 2018) (unpub. op.) (citing *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided

new ammunition against an appellant." *Barker*, 77 M.J. at 384 (citing *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007)).

### 2. Analysis

Trial defense counsel objected to portions of MP's statement, specifically that MP "lost [her] employment in Valdosta because [she] had to move to Mississippi to be near [her] daughter," that MP had been followed by investigators, and that MP felt Appellant "ha[d] [no] remorse for what he had done. He's just upset he got caught."

In an Article 39(a), UCMJ session, before she presented her statement to the members, MP provided clarification to the military judge about her victim impact. At the session and outside the presence of the members, MP described in greater detail the impact the case had on her, and her divorce and custody trial, testifying that the documents trial defense counsel turned over to her estranged husband resulted in her losing custody of her daughter to her own mother, and that MP had to attend alcohol counseling ordered by the court.

Initially, and although in error, the military judge did a Mil. R. Evid. 403 balancing test. In finding MP's statement relevant under R.C.M. 1001A, the military judge found evidence of a social and psychological impact on MP, and found the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice to Appellant. The military judge later addressed that he was in error in doing a balancing test, and simply looked at the confines of R.C.M. 1001A to determine if the contents of MP's statement would be allowed. In doing so, he allowed MP's statement to go forward as drafted.

The question for this court is whether the military judge abused his discretion in allowing the court exhibit and MP's presentation. We find that he did. The military judge stated he had "no doubt that [trial defense] counsel's actions . . . have caused [MP] additional psychological impact," and we agree with this statement. However, allowing that information potentially resulted in Appellant being held accountable for the actions of his attorneys, who exacerbated MP's status as a victim, and made MP's situation worse by the disclosure of evidence to her soon-to-be ex-husband, who may have used her situation to his advantage in their divorce and custody proceedings. While MP suffered personal consequences that *arose* as part of Appellant's actions and his counsel's litigation strategy, the statements admitted as written allowed MP to pin the blame of her personal situation onto Appellant. We find these statements went outside the scope of victim impact allowed, as her divorce and custody issues did not directly arise from Appellant's offenses.

With that said, we apply the test from *Bowen* to determine whether the error regarding MP's statement had a substantial influence on the sentence.

The Government had a very strong case against Appellant involving two victims. The facts surrounding the sexual assault committed against AM were extremely egregious and disturbing, and then just minutes after penetrating AM's vagina with his penis, Appellant sexually assaulted MP. Conversely, Appellant had few facts in his favor. Regarding the materiality and quality of MP's statement, we assess how much the erroneously admitted evidence may have affected the court-martial. *See United States v. Washington*, 80 M.J. 106, 111 (C.A.A.F. 2020). Here, trial defense counsel cross-examined MP on her divorce in findings, so this information was not a surprise to the panel at the sentencing hearing. Also, the information provided by MP was given through an unsworn statement, and the military judge appropriately provided guidance through an instruction to the panel on how to consider the information and that the weight and significance of that unsworn statement rests "within the sound discretion of each court member." Applying the *Bowen* test, we find the admission of MP's victim unsworn statement did not substantially influence Appellant's sentence, nor affect the court-martial, and we are confident the panel gave MP's statement the proper weight it deserved.

## D. Conditions of Appellant's Post-Trial Confinement

### 1. Additional Background

Appellant spent 33 days in pretrial confinement at the Lowndes County, Georgia, Jail, before his release and restriction to base.[8] After his conviction, Appellant was again confined in the Lowndes County Jail, where he remained for approximately two months before his transfer to a military confinement facility. On 29 March 2019, Appellant submitted a clemency letter to the convening authority, alleging that while confined in the civilian confinement facility, he was subjected to the following post-trial living conditions: (1) he had to share a single cell and toilet with 16 other prisoners, some of whom were gang members and suffering drug-withdrawal symptoms; (2) he suffered physical attacks and injuries from other prisoners; (3) the guards were not located close to his cell and neglected calls for help; (4) cleaning supplies were never made available to clean the toilet; (5) confinement officials withheld his mail; (6) he was not allowed any visitors until his transfer to military confinement; (7) confinement officials withheld food from him; (8) he was not permitted to go outside for the entirety of his two-month confinement; (9) he was not provided clean clothes; and (10) he had limited opportunities to bathe.

Appellant argues these post-trial conditions adversely affected him both physically and mentally. On 31 March 2019, the staff judge advocate wrote an

---

[8] Appellant was released by civilian authorities conditioned upon being restricted to base.

addendum to her 18 March 2019 staff judge advocate recommendation (SJAR). In the SJAR Addendum, she stated she received Appellant's clemency matters. Her recommendation to the convening authority, which was to approve the sentence as adjudged, remained unchanged. Action was taken on 5 April 2019.

On 10 April 2020, as part of his appeal, Appellant and his mother provided affidavits attesting to his conditions while in the civilian confinement facility. Appellant stated he did not file a complaint under Article 138, UCMJ, 10 U.S.C. § 938, because he was afraid of being labeled a "snitch," he knew his complaint would fall on deaf ears with the facility, and because of lack of access to his unit. In her affidavit, Appellant's mother, Ms. VR, noted that her son was not allowed visits during his time in civilian confinement and he did not have access to his mail. Ms. VR also declared that she noticed a decline in Appellant's mental state and that her son was refused medical care. Finally, she noticed a decline in Appellant's overall demeanor and appearance.

In response to Appellant's assignment of error regarding his post-trial confinement conditions, Appellee moved to attach two declarations: a declaration from Captain JC, the jail administrator at the Lowndes County Jail, and a declaration from MSgt GB, Appellant's first sergeant. That motion was granted by this court. The declarations were deemed relevant to rebut Appellant's allegation of his post-trial conditions.

In his declaration, Captain JC outlined basic rules, standards, and conditions for inmates. Captain JC noted Appellant did file six grievances with the facility; however, Appellant never submitted any complaints about the conditions of his cell, concerns about his safety, not receiving mail, or being denied visitors. Captain JC also stated there were no records indicating Appellant was ever assaulted while confined at the jail.

MSgt GB declared that Appellant did complain he did not receive mail, but that Appellant did not show up at the designated location to pick up mail. MSgt GB also refuted Appellant's claims that his unit did not visit him. MSgt GB stated he attempted to resolve any complaints Appellant raised to him about the conditions of his post-trial confinement.

Finally, on 7 July 2020, this court granted a request from Appellant to attach an affidavit from Appellant's wife regarding his post-trial confinement conditions. In this affidavit, Ms. VJ stated she saw injuries to her husband (through video chat), including a black eye and swelling around his lip. Ms. VJ stated Appellant did not tell her what happened to him until he was transferred to the Naval Consolidated Brig in Miramar, California; the true nature of what happened to Appellant is unknown, but according to Ms. VJ, it appears to have been a violation of the "snitch code."

**2. Law**

We review de novo whether an appellant has been subjected to impermissible post-trial confinement conditions in violation of the Eighth Amendment or Article 55, UCMJ, 10 U.S.C. § 855. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)).

"[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). As the United States Supreme Court has explained, "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). This includes protecting prisoners from violence committed by other prisoners. *Id.* at 833.

A violation of the Eighth Amendment is shown by demonstrating:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [an appellant]'s health and safety; and (3) that [an appellant] "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ . . . ."

*Lovett*, 63 M.J. at 215 (first omission in original) (footnotes omitted) (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997)).

Our superior court has emphasized that "[a] prisoner must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions." *Wise*, 64 M.J. at 469 (citing *White*, 54 M.J. at 472). "This requirement 'promot[es] resolution of grievances at the lowest possible level [and ensures] that an adequate record has been developed [to aid appellate review].'" *Id.* at 471 (alterations in original) (quoting *Miller*, 46 M.J. at 250). Appellant must show that "absent some unusual or egregious circumstance . . . he has exhausted the prisoner-grievance system [in his detention facility] and that he has petitioned for relief under Article 138, UCMJ." *White*, 54 M.J. at 472 (citation omitted).

Under Article 66(c), UCMJ, we have broad authority and the mandate to approve only so much of the sentence as we find "correct in law and fact and determine, on the basis of the entire record, should be approved." The scope of our Article 66(c), UCMJ, authority to consider claims of post-trial confinement conditions "is limited to consideration of these claims as part of our determination of sentence appropriateness." *United States v. Willman*, No. ACM 39642, 2020 CCA LEXIS 300, at *17 (A.F. Ct. Crim App. 2 Sep. 2020) (unpub. op.) (quoting *United States v. Towns*, 52 M.J. 830, 833 (A.F. Ct. Crim. App. 2000), *aff'd*, 55 M.J. 361 (C.A.A.F. 2001)). "It is also limited to claims based on post-trial treatment that occurs prior to the action of the convening authority and which is documented in the record of trial." *Id.* (quoting *Towns*, 52 M.J. at 833).

### 3. Analysis

This is not the first time this court has seen an appellant bring forth a post-trial confinement claim from Lowndes County Jail. Earlier this year, we considered in *United States v. O'Bryan*, No. ACM 39602, 2020 CCA LEXIS 211 (A.F. Ct. Crim. App. 24 Jun. 2020) (unpub. op.), a case where the appellant made similar claims against the facility. Interestingly, the appellant in *O'Bryan* was incarcerated at the Lowndes County Jail just months before Appellant in the present case was transferred there. *See id.* Our court also reviewed an affidavit from Captain JC in *O'Bryan*. *See id.* at *8. Ultimately, no relief was granted in that case.[9,10]

In this case, by the time Appellant submitted his clemency response to the convening authority, Appellant had been moved to a military confinement facility. Although Appellant made reference to his confinement conditions in his clemency submission to the convening authority, Appellant acknowledged that he did not file a complaint under Article 138, UCMJ, because he was afraid of being labeled a "snitch," he knew his complaint would fall on "deaf ears" with the facility, and because of lack of access to his unit. Appellant relies on the "snitch code" for his justification for not addressing his issues with command.

---

[9] As in *O'Bryan*, Appellant's claims of maltreatment at Lowndes County Jail were documented in the record in his clemency response. In *O'Bryan*, the appellant's defense counsel submitted a statement outlining the conditions; in the present case, Appellant did not. *See O'Bryan*, unpub. op. at *5.

[10] We also note *United States v. Melson*, No. ACM 36523, 2007 CCA LEXIS 372 (A.F. Ct. Crim. App. 14 Sep. 2007) (unpub. op.), where the appellant in that case alleged pretrial confinement conditions at Lowndes County Jail. In *Melson*, trial defense counsel failed to raise illegal pretrial punishment at trial. *Id.* at *2. This court granted the appellant relief pursuant to *United States v. Suzuki*, 20 M.J. 248 (C.M.A. 1985). *Melson*, unpub. op. at *19.

Captain JC acknowledged in his affidavit a "snitch code," where inmates give information to officers, but stated the jail "protect[s] the information and identity of inmates that give us information." Captain JC's affidavit also noted Appellant filed six grievances with the facility; however, five of those grievances were filed when Appellant was in pretrial confinement.

Despite having command visits while at the civilian confinement facility, the first time Appellant complained to his command about his post-trial confinement conditions was in his clemency submission after he had already been transferred to a military confinement facility. The requirement that a confinee must seek administrative relief, including under Article 138, UCMJ, "'promot[es] resolution of grievances at the lowest possible level [and ensures] that an adequate record has been developed [to aid appellate review].'" *Wise*, 64 M.J. at 471 (alterations in original) (quoting *Miller*, 46 M.J. at 250). As in *O'Bryan*, had Appellant filed an Article 138, UCMJ, complaint and a prisoner grievance while in the civilian confinement facility, the record would reflect what action, if any, his command and prison officials took in response. Also, Appellant does not convincingly explain how raising issues of hygiene, visitation rights, and the receipt of mail would result in adverse consequences to him from confinement officials or inmates. Yet, although he was aware of the grievance procedures, as attested to by Captain JC, Appellant failed to make his grievances known to his command and prison officials and thus made it impossible for them to ameliorate, let alone record, all of his grievances.[11]

By failing to raise his issues to prison officials or his command, Appellant has not shown deliberate indifference by the Lowndes County Jail. "[A] military prisoner's burden to show deliberate indifference [by prison officials with respect to his health or safety] requires him to show that 'official[s] [knew] of and disregard[ed] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Lovett*, 63 M.J. at 216 (alterations in original) (quoting *Farmer*, 511 U.S. at 837). The record shows Appellant has failed to meet his burden that he was subjected to any forms of cruel or unusual punishment. As a result, Appellant is not entitled to any relief for his alleged Eighth Amendment or Article 55, UCMJ, violations. Further, for the reasons already articulated, we also do not

---

[11] We note the affidavits from Captain JC and MSgt GB were written over a year after clemency was submitted. MSgt GB's affidavit would have been much more powerful had he been given an opportunity to rebut Appellant's claims in March 2019, instead of April 2020; yet, there is no evidence the convening authority or the staff judge advocate addressed Appellant's allegations with Lowndes County Jail.

grant relief under Article 66, UCMJ, for his alleged post-trial confinement conditions.

We have also considered whether Appellant's assertions warrant sentence relief under our Article 66(c), UCMJ, authority. We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (footnote omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ. In determining whether a sentence should be approved, our authority is "not legality alone, but legality limited by appropriateness." *United States v. Nerad*, 69 M.J. 138, 141 (C.A.A.F. 2010) (citing *United States v. Atkins*, 23 C.M.R. 301, 303 (C.M.A. 1957)). This authority is "a sweeping congressional mandate to the Courts of Criminal Appeal to ensure a fair and just punishment for every accused." *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (internal quotation marks and footnote omitted). This task requires "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (internal quotation marks and citation omitted). In conducting this review, we must also be sensitive to considerations of uniformity and even-handedness. *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citing *United States v. Lacy*, 50 M.J. 286, 287–88 (C.A.A.F. 1999)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *Nerad*, 69 M.J. at 146.[12]

There is no question Appellant's crimes are serious. Appellant sexually assaulted two women—one victim who was incapable of consenting, the other a victim of bodily harm—both in a matter of mere minutes. Based on our review of the entire record, we find that Appellant's sentence is appropriate for the offenses he committed.

---

[12] Although we exercise our authority to consider outside-the-record matters to determine if Appellant's sentence is correct in law under Article 55, UCMJ, and the Eighth Amendment, *see United States v. Erby*, 54 M.J. 476, 478 (C.A.A.F. 2001), we are precluded from considering additional information about those conditions that Appellant presents in his post-trial statement of facts to determine if his sentence is appropriate and "should be approved" as part of our Article 66(c), UCMJ, review. *See United States v. Jessie*, 79 M.J 437, 441 (C.A.A.F. 2020).

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court